**RYLEY CARLOCK & APPLEWHITE**
One North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4417
Telephone: 602-258-7701
Telecopier: 602-257-9582

Andrea G. Lisenbee - #019882
alisenbee@rcalaw.com
Kevin R. Heaphy – #026266
kheaphy@rcalaw.com

Attorneys for Defendant *Better Business Bureau, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| NEW YORK STUDIO, INC., a Delaware corporation, ATLAS INTELLECTUAL PROPERTIES, L.L.C., a Delaware limited liability company, RISE OF THE PHOENIX, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>THE BETTER BUSINESS BUREAU, INC., an Arizona non-profit corporation,<br><br>Defendant. | No. 2:10-cv-02078 SRB<br><br>**DEFENDANT BETTER BUSINESS BUREAU, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Oral Argument Requested<br><br>(Assigned to the Honorable Susan R. Bolton) |

**MOTION**

Pursuant to Rule 56, *Fed.R.Civ.P.*, Defendant Better Business Bureau, Inc. ("BBB") moves for summary judgment as to all claims asserted against it by Plaintiffs New York Studio, Inc. ("NYS"), Atlas Intellectual Properties, L.L.C. ("Atlas") and Rise of the Phoenix, Inc. ("Rise").

This action is entirely based on BBB's combined reporting on a group of commonly owned and controlled, interconnected and overlapping, Phoenix-based business entities and trade names. In August 2009, Plaintiffs, which are based in Delaware and claim to be unaffiliated with the group the BBB reported upon, apparently obtained one of the trade names. Plaintiffs, however, failed to apprise the BBB of that fact for a year. Now, Plaintiffs claim BBB's reporting, which was not updated because

BBB did not know an update was even appropriate, gives rise to defamation and tortious interference claims. Both claims fail as a matter of law.

The defamation claim fails because BBB issued only true, non-defamatory reporting that did not even concern Plaintiffs. Moreover, Plaintiffs cannot possibly establish that BBB knowingly or recklessly made false statements about Plaintiffs. Similarly, BBB cannot be held to have engaged in tortious interference because it did not know of any specific contractual relationships or expectancies of Plaintiffs, and because it lacked any improper motive or purpose in issuing its reporting.

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.    **FACTUAL SYNOPSIS**

   A.    **BBB's Mission, Operations And Reporting**

BBB is one of 116 non-profit organizations that subscribe to a set of business standards established to promote honest and ethical business practices. [BBB's Statement of Facts filed concurrently herewith ("SOF") at ¶ 1]. Each BBB organization independently reviews and reports upon businesses within a stated geographical area. [SOF at ¶ 2]. To promote good business practices, like all other such organizations, BBB encourages businesses to abide by established standards, reports on and rates businesses, and offers a forum by which consumers can submit complaints about businesses and a process to encourage such businesses to resolve consumer complaints. [SOF at ¶ 4].

BBB gathers consumer complaints and publishes its business reports primarily via its website: http://central-northern-western-arizona.bbb.org/. [SOF at ¶ 5]. Using a uniform template, BBB's website reporting for a given business generally consists of: the business's name(s), contact information, management, licensure, category of services or goods provided, complaints and categorical types of complaints submitted by consumers, government actions taken against the business, advertising issues identified, whether BBB considers the business to be "accredited" by meeting BBB governing standards, and BBB's letter grade "rating" of the business based upon

consideration of several criteria. [SOF at ¶ 6]. BBB generally bases its reporting on the previous 36-month period of time. [SOF at ¶ 7].

### B. The Report At Issue

This action stems exclusively from BBB's website report (the "Report")[1] on stated and confirmed affiliated business entities called NedGam Productions, LLC ("NedGam"), Edge 1 Productions, LLC ("Edge") and DGS Productions, LLC ("DGS"), hereinafter the "Gammon Entities," and the following trade names known to be used by these entities: "Academy of Cinema and Television" or "ACT" and "T*he*" (pronounced "tay"), as it existed between August 2009 and September 2010. [SOF at ¶ 11]. The Report: (1) specified that this group of entities and trade names was owned and managed by George Gammon ("Gammon"), (2) stated that a collective number of complaints (23 as of August 1, 2009, and 39 as of August 30, 2010) had been received by BBB concerning them over the past three years, most of which BBB deemed to be "serious," (3) identified that a government action – specifically a $25,000 fine issued by the Connecticut Attorney General against "T*he*" – had been taken in 2009, and (4) set forth that the BBB's rating of the group was an "F." [SOF at ¶ 12]. The only substantive difference between the Report as it existed in August 2009 and the Report as it existed a year later was an increase in the number of complaints. [SOF at ¶ 13].

Plaintiffs allege the Report contained the following false and defamatory statements:

- "T*he*" was affiliated with "ACT" or that "T*he*" and ACT are the same company (hereinafter, the "Affiliation Statement"); [SOF at ¶ 14].
- 39 complaints had been made by consumers against "T*he*" including 20 serious complaints (hereinafter, the "Complaints Statement"); and [SOF at ¶ 14].
- "T*he*" was a "drama instruction school" (hereinafter, the "Drama School

---

[1] A copy of the Report as it existed in approximately April 2010 is attached as Exhibit "1(A)" to the Statement of Facts.

-3-

Statement"). [SOF at ¶ 14].

Plaintiffs also allege that the Report tortiously interfered with their actual and prospective contractual relationships. [SOF at ¶ 15]. Both of these claims fail.

### C. The Report Accurately Treated The Gammon Entities, "ACT" and "T*he*" As Interconnected And Affiliated

BBB issued a single report for the Gammon Entities and their trade names in May 2009 for several reasons. [SOF at ¶ 16]. They were unquestionably under common ownership and control, and were stated affiliates of one another. [SOF at ¶ 17]. Public filings from Nevada and Arizona confirm that Gammon incorporated or co-incorporated the Gammon Entities, and registered them to do business in Arizona, in 2007 and 2008. [SOF at ¶ 17]. Subsequent public filings confirm that in early 2009, Gammon became the sole managing member of all three entities. [SOF at ¶ 18].

Under Gammon's direction, the Gammon Entities and their trade names "ACT" and "T*he*" apparently sold substantially similar offerings marketed as opportunities to develop child and teen acting and modeling stars. [SOF at ¶ 19]. Specifically, they offered classes to train children and teens in acting, modeling and related skills via the "ACT" side of the operation, and organized events to connect children or teens and their parents to industry professionals via the "T*he*" side of the operation. [SOF at ¶ 21].

The means of attracting consumers to these offerings was remarkably similar. Primarily, radio campaigns were used to suggest that either the classes or the events could provide a child an opportunity to be the next Disney or Nickelodeon star, or a chance to be featured in movies like the *Twilight* motion picture series. [SOF at ¶ 22]. The radio advertising frequently stated space was limited. [SOF at ¶ 24]. Parents who called were typically told to bring their child to an interview to see if he or she were a good candidate. [SOF at ¶ 25]. After being told that the child was a fit for either the classes or the event, parents were typically presented with contracts, asked to pay up front for the classes or event – usually between $1,000 and several thousand dollars – and were advised that this was the one and only chance to sign up. [SOF at ¶ 27]. The

contract forms used by "ACT" and "T*he*" were substantially similar, and each typically provided parents only 24 to 72 hours to cancel. [SOF at ¶ 28].

The Gammon Entities also employed overlapping employees and representatives. [SOF at ¶ 30]. For example, one person would communicate with BBB as a representative of "ACT" on one day, and the same person would do so as a representative of "T*he*" soon thereafter, and vice versa. [SOF at ¶¶ 31-33]. Specifically, before August 2009, BBB received responses to consumer complaints about "ACT" and to other complaints about "T*he*" from Gammon, Andrew Andrekopoulos ("Andrekopoulos") and Elizabeth Santana-Solis ("Santana-Solis"). [SOF at ¶¶ 31-33].

In March 2009, Gammon further confirmed the interconnected nature of these entities and trade names when he caused a lawsuit to be filed jointly on behalf of NedGam doing business as "T*he*" and Edge doing business as "ACT" with the U.S. District Court for the District of Connecticut. [SOF at ¶ 37]. The lawsuit alleged that a non-profit named BizParentz Foundation, formed to prevent the exploitation of minors in the entertainment industry, made certain statements critical of "ACT" and "T*he*" in advance of "T*he*" and "ACT" offerings in Connecticut. [SOF at ¶ 38]. In their pleadings, NedGam/"T*he*" and Edge/"ACT" expressly averred that: "THE and ACT are affiliated companies," and that disparagement of "ACT" also disparages "T*he*" "by association." [SOF at ¶ 39]. Ultimately, the District Court granted a motion to transfer the action to the Central District of California, noting:

- "ACT and THE overlap in ownership and appear to be related entities."
- "ACT also alleges that it operates in parallel with THE."

[SOF at ¶¶ 40-41].

In June 2009, BBB received a communication from Jon Michaelson,[2] an attorney for "ACT," requesting that BBB remove references to "T*he*" from its reporting on

---

[2] Although he noted that he represented only "ACT," Mr. Michaelson represented NedGam/"T*he*" and Edge/"ACT" in the Connecticut District Court case against BizParentz Foundation. [SOF at ¶ 43]

"ACT." [SOF at ¶ 42]. "ACT" claimed its reputation was being harmed by references to action taken against "T*he*" by the Connecticut Attorney General's Office. [SOF at ¶ 44]. BBB considered the request and requested information about the similarities and differences between the two. [SOF at ¶ 45]. In part, Mr. Michaelson presented brochures of "ACT" and "T*he*" which seemed to suggest an even stronger relationship existed between "ACT" and "T*he*" than had previously been known in that the two trade name operations appeared to cross-sell through testimonials like the following:

- "Students who attend ACT have the opportunity to participate in the semi-annual T*he* events, held around the country."
- "Kaitlin had spent [sic] quite [an] amount of energy working on her acting skills at [ACT's Salt Lake City] program, before going to Phoenix to compete at T*he*, where she landed 13 call-backs and quite a lot of experience. Kaitlin says her time with ACT and T*he* was amazing."
- "As a standout among her [ACT] classmates, Jett has a passion for acting that led her to compete at the T*he* event and to pursue opportunities in her local market."
- "After going through the ACT program, Lou was invited to attend T*he* where he received numerous callbacks and industry interest."
- "Her mom, sensing this was more than a phase, enrolled her in ACT and then she was invited to compete at T*he*."

[SOF at ¶ 46]. In view of the apparent cross-selling, substantial similarity between the operations, and common ownership and representation, BBB determined it was appropriate to continue to report on the Gammon Entities, "ACT" and "T*he*" in a single report. [SOF at ¶ 47].

    BBB's Report described the Gammon Entities, "ACT" and "T*he*" in precisely the same way that Gammon himself and a federal judge did, as an interrelated group. [SOF at ¶ 48]. Plaintiffs apparently concede that until August 2009, the Report was completely accurate. No other conclusion could be drawn. With Gammon as the

-6-

managing member of NedGam, DGS and Edge, all business conducted via these three entities and their trade names "T*he*" and "ACT," were uniformly directed, interrelated and operated in parallel, as the Connecticut District Court noted.[3] [SOF at ¶¶ 39, 41]. A single report for this conglomeration of interrelated entities and trade names was thus completely warranted and accurate.

### D. Plaintiffs Did Not Provide Notice Of Their Purchase Of The Trade Name "T*he*"

Plaintiffs apparently acquired the rights to use the trade name "T*he*" in August 2009 and began doing business as "T*he*" from offices located in Wilmington, Delaware from that point forward. [SOF at ¶ 49].

Plaintiffs allege that they began incurring damages due to alleged defamation and tortious interference stemming from BBB's Report from August 1, 2009 forward. [SOF at ¶ 50]. In essence, Plaintiffs allege that: (1) Plaintiffs have no connection to the Gammon Entities or to "ACT", (2) Plaintiffs obtained the trade name "T*he*" in August 2009 and it therefore automatically ceased being related to NedGam, DGS, Edge and "ACT" from that point forward, and (3) BBB's continued reporting that "T*he*" was associated with these others after August 2009 damaged Plaintiffs. [SOF at ¶ 51].

But, neither Plaintiffs – not NYS, Atlas or Rise – nor NedGam, DGS, Edge or Gammon – advised BBB that the trade name "T*he*" had been transferred to Plaintiffs. [SOF at ¶ 52]. BBB first learned of the purported trade name transfer via letter dated August 25, 2010, from NYS's counsel, and via a contemporaneous email message dated September 2, 2010, from Michael Palance ("Palance"), the managing member and principal of all three Plaintiffs. [SOF at ¶¶ 53-54]. These were the first instances in which BBB was told that entities wholly separate from the Gammon Entities, and seemingly removed from Gammon's control, were involved in the affairs of "T*he*." [SOF at ¶ 54]. In fact, these were the first communications BBB received from Palance

---

[3] With no apparent interest in the trade name "T*he*" until August 2009, Plaintiffs would have no standing to assert any defamation or other claim related to the Report prior to that time, and none of the Gammon Entities made any such claim.

or anyone identifying themselves as a representative of NYS, Atlas or Rise. [SOF at ¶ 55].

Upon receiving these communications from Plaintiffs, BBB immediately withdrew the Report from its website, replacing it with a version indicating only that BBB was updating its file related to the business at issue. [SOF at ¶ 56].

### E. "T*he*" Communicated With BBB Via Overlapping Representatives Both Before And After The Trade Name Transfer

Despite the purported change in ownership, for the yearlong period of time between the August 2009 trade name transfer and the time NYS and Palance provided notice to BBB of that transfer, it was not obvious that any transfer had taken place. [SOF at ¶ 57]. Again, no one associated with Plaintiffs or with the Gammon Entities advised BBB of the trade name transfer. [SOF at ¶ 57]. Without such notification, BBB had no reason to believe any change had occurred.

Moreover, BBB's interactions with what appeared to continue to be the Gammon Entities continued as usual. [SOF at ¶ 58]. For example, the same representatives that had interacted with BBB prior to August 2009 on behalf of the Gammon Entities, "ACT" and "T*he*" continued to interact with BBB on behalf of "T*he*" after August 2009. [SOF at ¶¶ 31-33, 59-60]. Specifically, Gammon, Andrekopoulos and Santana-Solis (the same representatives identified in Part I(C) above) each responded to consumer complaints made about "ACT" and other complaints made about "T*he*" *after August 2009*. [SOF at ¶¶ 31-33, 60]. Consumers have also noted that Gammon appeared to be a representative of "T*he*" after August 2009. [SOF at ¶ 61].

Without any notice of the trade name transfer, and without any change in the personnel interacting with BBB on behalf of "T*he*" both before and after the purported transfer, BBB had no reason to believe that any changes should be made to its reporting.

### F. Plaintiffs Have Damaged Their Own Reputation By Their Nefarious Business Practices

Plaintiffs do not approach this court with an impeccable reputation, irrespective

-8-

of any actions taken or statements made by BBB. To the contrary, discovery has revealed that several news stations have reported negatively on Plaintiffs and their "T*he*" operation after August 1, 2009. [SOF at ¶ 62]. Discovery has also revealed that many of Plaintiffs' own customers had extremely poor interactions and personal experiences with Plaintiffs. [SOF at ¶¶ 63-69]. Some consumers who attempted to cancel their contracts more than 72 hours after executing them, but still well before the event, have been refused any refund, even though the consumer received nothing of value. [SOF at ¶ 66]. Others who cancel within 72 hours, are refunded some money, but a $1,000 fee, which "T*he*" classifies as non-refundable, is withheld. [SOF at ¶ 68].

Plaintiffs' reputation also suffers because "T*he*" purposely seeks anonymity in doing business. It does not state its name in its advertising. [SOF at ¶ 70]. When the name "T*he*" is revealed during auditions, many consumers still cannot conduct any meaningful research because the word "the" is so common. [SOF at ¶ 71]. When the contract form reveals the name "New York Studio," consumers are told they must choose and pay before leaving. [SOF at ¶ 72]. Those who research "New York Studio" generally only find references to its virtual office, and usually then well after Plaintiffs have closed the local operation and the consumers have paid substantial sums. [SOF at ¶ 73].

In discovery responses that are factually baseless at best, Plaintiffs purportedly count several consumers within their stated universe of damages for BBB's alleged conduct, even though the consumers themselves indicate that BBB's reporting had nothing to do with their decision to cancel contracts for "T*he*" events or their opinion of "T*he*," and there is no evidence in the record to suggest otherwise. [SOF at ¶ 74].

In light of the foregoing, a fact-finder could not possibly find BBB liable for either defamation or tortious interference. Analysis of each of these claims follows.

II. **LEGAL ARGUMENT**

    A. **Plaintiffs' Defamation Claim Fails**

        1. A Heightened Standard Of Defamation Controls

In general, to prove defamation under Arizona law, at a minimum, Plaintiffs must demonstrate: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. Restatement (Second) of Torts §558; *see also Ledvina v. Cerasani*, 213 Ariz. 569, 572, 146 P.3d 70, 73 (App. 2006) ("[I]n the absence of clearly controlling precedent, Arizona's courts view the Restatement [(Second) of Torts] as authority for resolving questions concerning rules in defamation cases.").

In this case, given the nature of the parties and the context of the communication, additional proof of fault is required. Arizona law expressly recognizes that consumer reporting and other mercantile agencies, including specifically BBB organizations, enjoy a conditional privilege to supply information to the public about matters of common interest. *Antwerp Diamond Exch. Of Am., Inc. v. Better Bus. Bureau of Maricopa County, Inc.*, 130 Ariz. 523, 528, 637 P.2d 733, 738 (1981); Restatement 2d of Torts §596. This finding is consistent with the law in other jurisdictions.[4]

With this conditional privilege, mere negligence in reporting is insufficient to prove liability for defamation. Instead, Plaintiffs must prove that BBB engaged in what equates to "actual malice," *i.e.*, that BBB knowingly published false information or published false information with reckless disregard for its truth or falsity. *Antwerp*, 130

---

[4] *See, e.g., Elite Funding Corp. v. Mid-Hudson Better Business Bureau*, 629 N.Y.S.2d 611, 614 (N.Y. Super. Ct. 1995) ("Moreover, even were this Court to find that the challenged statements were not absolutely true, the defendant Bureau would nevertheless be entitled to summary judgment in the absence of any evidence whatsoever of express malice since the Bureau is entitled to the protection of a qualified privilege under the law of this State."); *Patio World v. Better Business Bureau, Inc.*, 538 N.E.2d 1098, 1102 (Ohio Ct. App. 1989) ("We agree with the trial court that the defendant [BBB] is entitled to a qualified privilege in the release of information within its files to the public. It is undisputed that the defendant is a not-for-profit corporation which, *inter alia,* provides reliability reports on businesses and stores in the Miami Valley area upon request so that customers may be served better by ethical providers."); *Audition Div., Ltd. v. Better Business Bureau of Metropolitan Chicago, Inc.*, 458 N.E.2d 115, 120 (Ill. Ct. App. 1983) ("We also find that defendants [BBB] properly assert their conditional privilege to speak freely in the interest of the public good.").

Ariz. at 528 (citing Restatement 2d of Torts, §600).[5]

Therefore, to prove liability for defamation in this action, Plaintiffs must prove: (1) that the statements in BBB's Report concerned Plaintiffs, (2) that those statements were false, (3) that those statements were defamatory, and (4) that BBB published false and defamatory statements concerning Plaintiffs knowing the falsity of those statements or with reckless disregard as to their truth.

### 2. BBB Did Not Know Of Any Alleged Falsity In Its Reporting And Did Not Act Recklessly As To Its Truthfulness

Plaintiffs do not claim that the Report was false and defamatory when originally made and before August 2009 (it was not), but rather that the Report ***became false*** when the rights to use the trade name "T*he*" transferred via an agreement between Plaintiffs and Gammon and the Gammon Entities. Plaintiffs apparently contend the BBB should have clairvoyantly known to drop all references to "T*he*" in reporting on the Gammon Entities as soon as the trade name transfer occurred.

As noted more fully above in part I(D), BBB was not apprised of the trade name transfer until a year after it occurred. BBB's Chief Executive Officer and its Director of Operations first learned that Gammon transferred the rights to use the trade name "T*he*" to Plaintiffs upon receipt of a demand letter dated August 25, 2010. [SOF at ¶¶ 53-54]. BBB had not interacted with, or even learned of the existence of, NYS, Atlas, Rise or Palance in any way prior to that time. Gammon and the Gammon Entities did not apprise BBB that they were no longer operating as "T*he*." Plaintiffs did not do so either.

Contrary to the apparent change in control of "T*he*", Gammon and other known representatives of the Gammon Entities continued communicating with BBB about complaints received concerning "T*he*" after August 2009. Between August 1, 2009,

---

[5] The same heightened standard of actual malice may also result because the Plaintiffs, each of which is a corporation or limited liability company, should be classified as at least limited public figures. *See American Future Systems, Inc. v. Better Business Bureau of Eastern Pennsylvania*, 923 A.2d 389, 405 (Pa. 2007), *cert. denied*, 552 U.S. 1076 (2007).

1 and the date of Plaintiffs' demand letter, BBB received twelve consumer complaints
2 related to "T*he*." (Three complaints were received related to "ACT" during this time.)
3 BBB forwarded each of the twelve "T*he*" complaints to the same email address it had
4 always used to contact the Gammon Entities. For each of the twelve complaints, a
5 response was received. At no time, however, was BBB advised of the ownership
6 change of "T*he*", advised to use Plaintiffs or Palance as future points of contact, or
7 provided any new contact information for "T*he*" complaints.

8       Without any knowledge of NYS or the other Plaintiffs' new rights to "T*he*," and
9 operating under the understanding that Gammon and the Gammon Entities continued to
10 control "T*he*," it is indisputable that BBB did not have and could not have had any
11 knowledge that any aspect of its Report may have become false.

12       3.      <u>The Report Did Not Contain Any Statement Concerning Plaintiffs</u>

13       Plaintiffs' defamation claim also fails because the Report does not even directly
14 refer to or concern Plaintiffs. It is beyond question that the Report does not identify or
15 refer in any way to NYS, Atlas or Rise, or their principal, Palance. Instead, the Report
16 clearly states that it concerns entities and trade names owned and managed by
17 ***Gammon***, all of which were based in Phoenix, Arizona. The Report referred to
18 Gammon and his entities, and BBB intended that its Report only refer to Gammon and
19 the Gammon Entities.

20       In the absence of BBB's intent to have its Report refer to anyone other than
21 Gammon and the Gammon Entities, the "concerning the plaintiff" element of
22 defamation can only be satisfied if recipients of the Report mistakenly but reasonably
23 understood it was intended to refer to Plaintiffs in their operation of "T*he*."
24 Restatement 2d of Torts §564.

25       There is no evidence in the record to even suggest that occurred in this case, as
26 Plaintiffs have not identified any consumer(s) who mistakenly understood the Report
27 was intended to refer to Plaintiffs' operation of "T*he*." Moreover, it would be
28 unreasonable as a matter of law for any public consumer or other recipient of the Report

-12-

to believe that BBB's reporting on a trade name created, owned and managed by Gammon and operated out of Phoenix could refer to business conducted under a similar trade name by different owners out of an entirely different state.[6] On this ground alone, Plaintiffs' defamation claim fails.

### 4. The Statements At Issue Were Not False Or Defamatory

None of the three statements identified by Plaintiffs as the basis of their defamation claim were false or defamatory.

#### *(a)   The Affiliation Statement Is Not Actionable*

With regard to the Affiliation Statement, as described more fully in parts I(C) and I(E) above, when written, the Report accurately described that a strong affiliation and interconnectivity existed between the Gammon Entities and their trade names "ACT" and "T*he*" from early 2009. The Affiliation Statement was thus completely accurate when originally made by BBB. "Substantial truth is an absolute defense to a defamation action in Arizona." *Read v. Phoenix Newspapers, Inc.*, 169 Ariz. 353, 355, 819 P.2d 939, 941 (1991) ("When the underlying facts are undisputed, the determination of substantial truth is a matter for the court.").

Moreover, even though Plaintiffs obtained the "T*he*" trade name in August 2009, the evidence suggests that Plaintiffs had a continuing affiliation with Gammon and other representatives of the Gammon Entities. Plaintiffs apparently obtained their interest in the "T*he*" trade name by paying a mere $10 and by agreeing to assume operating liabilities. This suggests a less than arms-length transaction. Plaintiffs have contracted with Gammon to consult with them related to "T*he*" through September 2013. [SOF at ¶ 75]. Plaintiffs also employ or use as independent contractors 21 people who previously worked for the Gammon Entities prior to August 2009, including Andrekopoulos, Cameron, Santana-Solis, Nathan Biay, Karileah Kaapana, Lindy Kwock, Lily Neda and Karah Van Kammen, each of whom held director or other

---

[6] This would be akin to pulling up a report on a Phoenix-based business with a generic business name like "AAA Plumbing" or "ABC Locksmith" by a consumer in another state interested in learning about a similarly named business in their area.

-13-

management positions with one or more of the Gammon Entities, and each of whom was repeatedly referenced in BBB's file on the Gammon Entities. [SOF at ¶ 75]. All told, these ties suggest that an affiliation existed and still exists between Gammon, the Gammon Entities, "ACT", "T*he*" and Plaintiffs.

Even assuming *arguendo* that "T*he*" ceased being affiliated with "ACT" and the other Gammon Entities as of August 2009, a statement linking "ACT" and "T*he*" cannot possibly be deemed defamatory for several reasons. First, most of the public has not heard of "ACT," and stating an affiliation with an unknown quantity is meaningless, not defamatory. In addition, to the extent "ACT" and "T*he*" are known to the public, "T*he*" has the more dubious reputation. "T*he*", not "ACT", is on record as having committed such serious misconduct that the Connecticut Attorney General issued a press release and publicly fined it $25,000. In June 2009, "ACT" (to the extent it is even separate from "T*he*") told BBB that lumping "ACT" in with "T*he*" damaged "ACT's" reputation. Finally, if association with "ACT" or the other Gammon Entities is defamatory, Plaintiffs voluntarily defamed themselves by transacting business with them to lease the trade name "T*he*".

### *(b)   The Complaint Statement Is Not Actionable*

With regard to the Complaint Statement, during the reporting period identified on the Report, it is true that 39 consumers filed complaints with BBB about "ACT", about "T*he*" or due to the interconnected nature of their operations about either "ACT" or "T*he*" or one or more of the Gammon Entities. The Report therefore was completely accurate in that a specified number of consumer complaints were made against the collective group of Gammon Entities and their trade names "ACT" and "T*he*."

### *(c)   The Drama School Statement Is Not Actionable*

Finally, the Drama School Statement was true in that "ACT" and "T*he*" advertised that they both provided instruction in acting, i.e. dramatic instruction, to children and teens. Moreover, a statement that an organization is a drama instruction school does not even approach being defamatory.

-14-

In sum, Plaintiffs fail to set forth any evidence capable of supporting multiple elements of a defamation claim. The record before the Court establishes as a matter of law that no reasonable fact finder could conclude that BBB either: (1) knowingly published false and defamatory information concerning Plaintiffs in its Report, or (2) published false and defamatory information concerning Plaintiffs with reckless disregard of its truth or falsity. The defamation claim must therefore be dismissed.

### B. Plaintiffs' Tortious Interference Claim Fails

To succeed on their tortious interference claim, Plaintiffs must demonstrate: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) resultant damage to the party whose relationship or expectancy has been disrupted; and (5) that the defendant acted improperly. *Miller v. Hehlen*, 209 Ariz. 462, 471, 104 P.3d 193, 202 (App. 2005); *Snow v. Western Sav. Loan Ass'n*, 152 Ariz. 27, 34, 730 P.2d 204, 211 (1986).

#### 1. BBB Did Not Have Any Knowledge About Plaintiffs' Alleged Actual Relationships Or Specific Business Expectancies

The tortious interference claim independently fails because the knowledge element cannot be established for several reasons. First and foremost, BBB did not know of the existence of NYS, Atlas or Rise until receipt of the August 25, 2010 demand letter. Immediately after receiving this letter, BBB placed its reporting on update status. Even after the demand letter was received, BBB had no knowledge that any specific third party had a contractual relationship with any of the Plaintiffs, and had no knowledge that any of the Plaintiffs considered any specific third party to be a business prospect. Specifically, BBB had no knowledge that one or more Plaintiffs had a contract with: (1) any casting or acting industry professional, (2) any facility sought to be used by Plaintiffs, or (3) any consumer who actually signed a contract with Plaintiffs, other than any such consumer who filed a complaint with BBB, and who had already

decided to cancel the contract and/or seek a refund. [SOF at ¶ 76]. Plaintiffs concede in their discovery responses that they never informed BBB of any actual contractual relationship or any prospective business relationship that they contend has been interfered with by BBB's conduct. [SOF at ¶ 77]. This alone makes the knowledge element incapable of proof.

In addition, BBB had no knowledge of any contractual relationship or specific business prospect of any of the Gammon Entities either prior to or after August 2009, other than consumers who filed a complaint with BBB via its website.

### 2. BBB Did Not Act Improperly

Determining whether an improper action exists involves balancing the following seven factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties. *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 494, 38 P.3d 12, 32 (2002). Factors deserving the most weight are the nature of the actor's conduct and the actor's motive. *Id.* All of these factors point to the appropriateness of BBB's reporting.

The nature of conduct factor requires evidence that BBB acted illegally or inequitably. *Bar J Bar Cattle Co. v. Pace*, 158 Ariz. 481, 484, 763 P.2d 545, 548 (App. 1988). No such evidence exists. As described above, BBB's reporting about the Gammon Entities does not constitute actionable defamation or violate any other law.

BBB's motive was pure. It published its Report, as it does with all of its reporting, to assist consumers in making choices about the products and services they buy, and to promote good business practices by challenging businesses, and in this case the Gammon Entities, to act responsibly in the face of input from consumers, government agencies and others. On the subject of motive, it is noteworthy that "[o]ne

who interferes with the contractual rights of another for a legitimate competitive reason does not become a tort-feasor simply because he may also bear ill will toward his competitor." *Bar J Bar*, 158 Ariz. at 485, 763 P.2d at 549. In this case, BBB's motive is even more innocuous. BBB is not a competitor of Plaintiffs (or the Gammon Entities), and it derives no revenue from reporting on any business. It bears no ill will towards the Gammon Entities or to Plaintiffs. It merely wishes to promote the marketplace by providing information to consumers and feedback to businesses. BBB's motive is intrinsically tied to and overlapping of factors (d) and (e).

The factor (c) interest of Plaintiffs is not a significant factor at all because of factors (f) and (g). BBB has little if any direct relationship with Plaintiffs. In fact, Plaintiffs never even directly communicated with BBB until August 2010. In addition, BBB's reporting has no direct proximity to the business of Plaintiffs. The proximity is indirect in that the Report discusses, as only one of its aspects, the trade name "T*he*" as it existed prior to being acquired by Plaintiffs.

In sum, no reasonable fact finder could find that BBB acted improperly, and Plaintiffs' tortious interference claim must be dismissed.

### III. CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of BBB, dismissing all claims in this action asserted by Plaintiffs.

DATED this 14th day of November, 2011.

        RYLEY CARLOCK & APPLEWHITE

        By  s/Andrea G. Lisenbee
           Andrea G. Lisenbee
           Kevin R. Heaphy
           Attorneys for *Defendant Better*
            *Business Bureau, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically transmitted the attached using the CM/ECF System for filing and a transmittal of a Notice of Electronic Filing was transmitted electronically to:

Steven M. White
Paul D. Ticen
White Berberian PLC
60 E. Rio Salado Pkwy, Ste. 900
Tempe, Arizona  85251
swhite@wbazlaw.com
Counsel for Plaintiff

David Ludwig
Ellis L. Bennett
Dunlap Grubb & Weaver PLLC
199 Liberty Street SW
Leesburg, VA 20175
Counsel for Plaintiff

DATED this 14th day of November, 2011.

s/Tina Kaminski

2042670.3
11/14/11